to용 Good afternoon. Thank you to council for joining us for this morning's meeting of the Plaintiff's Appellants. Very well, Mr. Quinlan, we'll hear from you first. Good morning, your honors. May it please the court. We're here today on the question of the Plaintiff Appellants standing to challenge the constitutionality of St. Louis County's COVID stay at home order whereby the Plaintiff's Appellants were prohibited from gathering for religious activities in groups of more than nine people. The standing question before the court is redressability. And to determine whether Plaintiff's Appellants have sufficiently alleged redressability requires the identification of the harm and the remedy Plaintiff's Appellants have requested in order to redress that harm. And although the merits of the case are not before the court immediately, it should be noted that the United States Supreme Court in its rulings in the Diocese of Brooklyn versus Cuomo and Tandon versus Newsom has removed all question that the discrimination against religious exercise contained in the county's stay at home order is unconstitutional. This is important for standing analysis in identifying the harm Plaintiff's have suffered. Plaintiff's straightforwardly have alleged this harm, this discrimination in their complaint at paragraphs 14 through 21, paragraphs 29 through 30, and paragraphs 38 at pages A8 through A10 of Appellant's appendix. There is no question that throughout this proceeding, I'm sorry, through the proceeding in the lower court that the Plaintiff's challenged the constitutionality of the disparate treatment it gave to religious exercise as a so-called essential activity compared to the other designated essential activities set forth in the order. It alone, religious exercise, religious activities, was subjected to the nine-person gathering size limitation. While Plaintiff's were forbidden or prohibited from engaging in religious exercise in groups of nine or greater, ten or greater, all manner of secular activities from grocery stores to big box home improvement stores to Wal-Marts and so forth, even laundromats and so on, were allowed to take place. This is clearly contrary to the teaching of the Supreme Court in the, I don't have the pronunciation right, but it's now clearly, and I'm going to say this, it's now clearly established in the context of COVID restrictions in the Brooklyn diocese and the Tandon cases. They have straightforwardly alleged their harm, and they have straightforwardly alleged the remedy that they seek for that harm. The redress that they seek to have is an injunction against the defendants, appellees, the county executive and the county director of health, to enjoin them from enforcing the order, that is to say, to enjoin them from enforcing the discrimination that is embodied in the order. This is what we seek and it's clearly within the, pleaded within the complaint and in plaintiff's motion for temporary restraining order at pages A13 through 14 of the appendix, which is the plaintiff's prayer for complaint, prayer for relief in its complaint, which states simply this. Wherefore, plaintiffs respectfully pray for a judgment in their favor and against defendants jointly and severally, declaring the order unconstitutional and invalid, and entering temporary preliminary and permanent injunctions against implementation and enforcement of said order. And the word of attorneys and so forth and so on. Yes, ma'am. Mr. Quinlan, where in your complaint expressly do you believe you best allege religious gatherings of more than nine disconnected from a church building? Well, the first place to find those is in paragraphs one through three, which introduce each of the plaintiffs. Now, I understand that our pleading has a glitch in it that we have two sets of paragraphs, one through three and four. But if you go to the parties starting on page two, paragraph which is A2 of the appendix. Paragraphs one, two, and three each contain, in essence, this allegation. As a result of the restrictions imposed by the defendants as set forth below, each plaintiff has been unable to attend Sunday services and other religious activities in which each plaintiff usually participates and has been impeded in their exercise of the rights to freely associate and assemble and to the freedom of expression. And then the next sentence is the church building in which they regularly worship and describes the location. So are you saying that from that one sentence, the inference is other than what is identified in the next sentence? Well, so the county's argument is, and the trial court ruled, that we were seeking to have our closed churches reopened. And that is not, of course, there's no allegation in the complaint that our churches were closed, nor is there a prayer for relief that asks that they be reopened. In fact, it's undisputed on this record that the churches in St. Louis County were not closed. And what this says here is that church or Sunday services, which may or may not take place in a church, and other religious activities have been impeded by the discriminatory order. Now, the reference to the church building does not limit the allegation to only in-church activities, but clearly, but we're not saying that we're asking for relief for non-church, only for non-church activities. Clearly, our churches were open. The problem was, even with open churches, we couldn't assemble with more than nine people. There's nothing in the complaint, as I read it, that indicates what the churches are doing, correct? Because this is only the plaintiffs, individual plaintiffs are bringing this case, not the church, correct? That is correct, Your Honor. And so, our position is, of course, that the order was not  fact, was it imposed against businesses, except indirectly, because the churches were not closed. The nature of the order was one that prohibited people from leaving their homes to engage in anything other than essential activities. The only essential activity that received a gathering size limitation under the challenged order is the activity of engaging in religious activities of more than nine people. So, yes, the plaintiffs are proceeding as individuals, because whether in churches or in places other than churches, this order prohibits them from engaging in religious activities of more than nine people. And that's a discrimination that's playing on the face of the order. And as individuals who are directly regulated by the order, they clearly have standing to seek an injunction that forestalls that discrimination. I'll give you my question now, Mr. Quinlan. In your brief, in this court, on page 25 of your brief, you say it is a reasonable inference that the churches would return to their prior practice of holding larger than ten-person services. So I had two questions about that. First of all, is that alleged in the complaint? And if so, where? Well, this goes back to the  is a hypothetical argument. It's a hypothetical argument that the church is not  It's a hypothetical argument that takes at face value the challenge that we sought the reopening of our closed churches, which we never alleged and we're not seeking, and we can obtain redress of the discrimination that we suffered with an injunction against the enforcement of the order against us as individuals. Taking the hypothetical, and I would even say straw man constructed by the county and that all we were seeking was the reopening of our churches. Our argument is that under the Whelan case, where we are entitled at the pleading stage to a liberal inference that if the injunction were given, that the any third-party actor Again, there's no specific reference to it in the pleading because that's not what our case is about. Our case is not about freeing up third-party actors to give us something that we don't have. We want to have the freedom that the Constitution guarantees to us in the First Amendment to exercise our religion in a manner that is not discriminated against, that is in fact discriminated against by the order. Let me ask my second question because the complaint does allege though that you want to attend Sunday services, so presumably there has to be someone holding the service in order for you to attend it. That's why I gather you were arguing it was a reasonable inference that the churches would return to their prior practice of holding larger than ten-person services. My second question is, if you prevail on that and there's sufficient pleading on that question, then how would this case proceed in the district court? Because the county would be entitled to defend as a factual matter that you lack standing. Would we have witnesses from the churches testifying hypothetically what they would have done in May of 2020 if the county order had been enjoined in order to determine whether the services would have been held? Is that how you see this proceeding? If not, tell me how you see it proceeding in the district court. I would see it proceeding in the district court on summary judgment on the legal question of whether or not the discrimination as set forth in the order is constitutional under the Supreme Court's recent ruling. On the standing issue, how do you see it proceeding in the district court? How would this be litigated as a regressibility question? I think the plaintiffs would each testify as to the religious activities that they engage in which they would want to engage in in groups of larger than nine people that may involve church services. We do have the situation where they are now, under the modified order, allowed to go to church in larger groups according to modified order. But I would anticipate that I think it would not be beyond the realm of speculation for church leaders to come into court and testify that if the county's order were lifted, they would have complied with the order. In other words, to whatever extent they may have been closed, they would reopen to the extent permitted by the status quo ante if the order were set. Because the injunction would simply say... I just wonder if that question really is moot, though. Isn't that just a hypothetical as to what these churches would have done a year ago? Probably, yes. All right. I see you're into your rebuttal time. Would you care to save the balance? If there are no other questions, I would, Your Honor. Very well. You may. Thank you for your argument. Mr. Perryman, we'll hear from you. May it please the Court, Counsel, good afternoon. I'm Neil Perryman, and I represent Dr. Page and Dr. Doucette. I want to just go back to the way things were back in the pleading of this case. The case was filed on April 28th. April 28th, Mr. Quinlan, on behalf of his clients, files his motion for TRO. Schedule is entered. He then files a memorandum of law, which is contained at page AA31 of our appendix. It's their four-page response to our lack of standing argument. Not a word is mentioned about our primary argument that all they really plead is churches. This was all about churches. As in the TRO memorandum, this was all about churches in their response. The writ to this court that was filed, if you go back and read it, until May 5th, that was what they were complaining about, that churches couldn't have more than nine people in them at one time. May 6th, we filed our motion to dismiss based on lack of standing on May 4th. On May 6th, they filed their four-page response, which I just referred to. Not a word in there about how they could have standing in respect to the churches because of the issues that have been hinted at already this morning, this afternoon. One is, why did the churches close? Did they close because of the order or for some other reason, and that is not pleaded? There's no traceability. Council, I want to ask you about that. Are we setting up some sort of heightened pleading burden here? I tend to agree with opposing counsel that the churches were open before, the churches are open after. They plead that they want to go to church. It seems to me that it doesn't, at least at the pleading stage, we're not talking about summary judgment, but a reasonable inference would be they probably reopened, or at least that's something that is at least reasonable under the circumstance. It might not be the only inference, but it's a reasonable inference under the circumstances. Yes, I don't think that's reasonable. I don't think it's reasonable because we don't even know what these churches are, what their rules are. I know of many churches, they haven't told us, they've chosen not to, that continue to not have in-person services or require in-person services as of April of this year. The Archdiocese of St. Louis has given dispensation still to people attending Sunday Masses. We don't know, based on the state of the pleadings. I don't think the inference is reasonable. I don't think the Whelan case that was referred to supports any inference like that. That case was very different. As the court knows, that was based upon a decision of Missouri to stop providing contraceptive care after a decision was issued in the Eastern District of Missouri, one that I actually was a part of, representing the plaintiffs in that case. And the evidence was that both based upon the laws that existed beforehand and the reasons that were in the record, why they ceased offering a plan that didn't offer contraceptive coverage, that that would be offered again. Not to mention there was a reference in that case that Judge Wolman wrote to the Religious Freedom and Restoration Act, which provided, they argued and it was unchallenged, that they would have been obligated as a matter of statutory law to provide that contraception-free coverage anyway. Here we don't know what the church is, why they closed, those facts aren't pleaded. As to your heightened pleading standard, my understanding of the case law, Judge, is that the plaintiff has the burden of establishing standing to sue. And they didn't do it, in my judgment. And that was really clear  until we morphed into what other religious services means and that the definition has changed over time. Well, let me ask you about that. So we have this statement under the parties, the other religious activities in the complaint, and I understand it's only there, but it's not hard to figure out what some of those activities might be, like funerals, weddings. In the Jewish religion, for example, we gather in groups of 13. We have to gather in groups of 13 when a family member dies. The family gathers together. That obviously would have been illegal under the order. Again, so why shouldn't we read the complaint more liberally as encompassing some of those things? We could not sit shiva, for example, for a family member because of some of these stay-at-home orders. That's an interesting question, and had they pleaded that I'm a person of the Jewish faith, I wish to attend a funeral, and I have to have 13 according to my law. Those facts aren't in this complaint. Not pleaded at all. That's the problem, which we're in a hypothetical land of all this. When we talk about Mr. Quinlan says he wants an injunction, how can we establish a record of harm based on what was happening back in May of 2020 when Justice Alito said in the Calvary dissent, there was maybe some blunt instruments. Science wasn't there. People were scared. A year later, and I don't accept the reference that Panda and Cuomo cited either. You know, the arbitrary rules in California until February 2021, zero people could attend a cavernous cathedral. Governor... Hold on just a second, Mr. Perryman. We're having trouble with your audio. I don't know if you did anything. We were hearing you fine originally, but then it started to cut out. Okay, I've got to... Is that better, Judge? Yes, that's better. Okay. I kind of lost you. You started to talk about Cuomo and Tandon, and you were cutting in and out, so you might restart there. I was just going to say, first of all, I don't know how he's asked for an injunction, how we could get an injunction and there be an irreparable harm that could be met in May of 2020 when you consider the circumstances at the time. That's what you have to do under Calvary and the law. As far as Tandon and Newsom, what I was saying, excuse me, the Archdiocese of New York case and the Tandon versus Newsom case, I don't think that those are apples to apples at all. I don't want to let that go unsaid. You know, in California, I think there were five Supreme Court appeals and almost a rebuke in this last one. Why aren't you listening to us, Ninth Circuit? In the South Bay case, they talk about how they couldn't understand, seemingly arbitrarily, that a cavernous cathedral could have zero people in it, but people could go elsewhere. That kind of arbitrariness doesn't exist here. In the Governor Cuomo case, the Archdiocese case, changing from orange to red on a moment's notice, I get that. We're not there yet because we never reached the merits in this case because all the very good questions Judge Strauss asked aren't in this complaint. In your view, counsel, I just want to understand the argument. The complaint would have been sufficient if specific things other than Sunday services would have been mentioned. So, for example, a funeral. I want to attend a funeral, but I couldn't attend the funeral. I think that's exactly right. And I need to do it in a larger group that is permitted according to my faith. Something like that might be appropriate. But that's not there. Wouldn't it depend on whether the church was willing to hold the large funeral? Of course. That's another problem, right? The redressability issue. If the relief is granted, would they even do it? That's not pleaded either. So, we're locked in kind of this hypothetical situation. And there was no height, Judge Strauss. Again, go back and read their memorandum in support of their motion for a TRO, which is in our appendix. Read their writ to this court. Your dissent clearly understood this to be religious services. I think we all thought that was the case until they said, no, no, no, no, it's not churches. It's something else. And that's how this all changed. We raised standing on May 1st. Three days after they filed their complaint, we identified the problem. They could have pleaded that I'm a person of the Jewish faith, got a funeral to attend, we have to sit ship on the 13th. I'm quite butchering that. That's not in the complaint. So, as far as this issue of closed churches... We're losing your audio again for some reason. I don't know if you're moving. I think it's my fault. I tend to move when I talk, so I apologize for that. As far as this issue about Judge White referring to closed and open churches, everybody understood what that meant. And I would encourage the court to read the 28 J letters that Mr. White wrote. He specifically understands that what Judge White meant was they sought reopening of churches to have more than nine people in them. That's the way he phrases it. There's no question about that. Everybody knew it. Judge White knew it. He wrote it in the order that nine could attend. And as far as this other issue on mootness, Judge Colleton, you hit it at it, which is since this lawsuit was filed. It's been now 11 months. We don't have any other challenges to our order. On May 18th, the order complained of was lifted. On June 1st, 25% of people could attend gatherings in churches. There's been no challenges of unconstitutionality based upon the county's orders other than this last one. We really believe that they failed to plead standing under, and they had every opportunity to do so, and they didn't. I don't know why. Mr. Quinlan can explain it if he wants to. He doesn't have to. We've asked a number of times. We've said you haven't pleaded it. They could have amended. Heck, they could have sued. They were dismissed without prejudice. They were dismissed without prejudice. They could have brought a new claim two weeks later if they felt infringed and added more specificity to overcome what Judge White said. Instead, what they did, both in their writ and their emergency appeal to this court, was seek the ultimate relief. Counsel, I have a question on the mootness issue, which is we've been asked to take judicial notice of several statements in one of the earlier motions, and I've checked some of the more recent orders. I think they might have come in connection with that motion for judicial notice, and even just recently, within the last month, it talks about in the event the trajectory, and I'm quoting, of COVID-19 cases begins to rise again in St. Louis County, the county may adopt emergency policies to alter previously defined strategies for isolation and quarantine. So I think the county itself is recognizing, and it goes on, I don't want to say that's all it wrote, as you know, but my point is, although there isn't a history of moving the goalposts like in Cuomo, I think these orders recognize that the goalposts are pretty malleable and they could change at a moment's notice depending on the trajectory of COVID-19. What's your response to that in terms of moveness? My response to that is that there is no threat of arbitrary goalposts moving in this case, and the 11-month history has shown that. Number two, of course, Judge, if things change, actions have to be taken. You know, this whole thing started with Dr. Onder. Everybody agreed, if you read the opening papers, the initial use of police power was necessary, and this was a really dangerous disease. But they said, you know what, we've already flattened the curve. This is now arbitrary to have these restrictions in place. Guess what happened if you look at the chart? You know, Dr. Onder, if you look at his, oh, by the way, his affidavit submitted in support of their motion for TRO at paragraph 21 also makes clear what they were talking about was churches at the time. But regardless, nobody disagreed early on that reaction was necessary to stem the tide. Their basic argument was it had become arbitrary because there was no longer a threat. But we all know what happened after this. In July, at the time we had a few thousand dead, and it's now 10 times Vietnam in a year. So you can say whatever you want to, but they never said that we didn't have the power. And of course, if something else happens, the government, the politically accountable officials, not a federal judge who gets an affidavit from another doctor, has to make those decisions. And they will be then challenged for their constitutionality. But I would submit that there have been no challenges because there is no longer this differentiation. I don't believe there has been since May 18th that the only entity that can't gather is a church. And there were reasons for that. So, Mr. Pearman, what are the restrictions right now? Is it just the restrictions on the number of people both inside and number of people outside in a currently 50% of fire code occupancy, both churches and every other business. So a church qualifies then as a business under the order? Yeah, it did at least as of June 1st, 2020. The only other thing I'd like to point out, unless the court has other questions, is this question of Usbanon. And I had to look that up or have a friend of mine look it up because I, too, couldn't pronounce it, Mr. Quinlan. But there is this issue of damages and mootness. All they requested was an injunction. They didn't plead nominal damages. They didn't plead compensatory damages. It was never about damages. And I want to just hearken back to, again, Judge Colleton's question. Would we go back and have an advisory opinion from Judge White about how we might have handled this even though it doesn't exist anymore? How would he issue an injunction, given database and what would have to be required about irreparable harm? Well, the reason I asked was I assume that even if this court said there was an adequate pleading on regressibility, the county would argue as a factual matter the churches would not have hosted large gatherings on May 8th of 2020. And I assume then there would have to be evidence taken about that. And I was just questioning whether that's a hypothetical scenario that's not live. I don't think it's live. And there's no controversy anymore. And the other issue is that we simply don't know what church, what the rules were, what they were impeded from, how the order would reflect, how the relief would be granted. It's just not known because they didn't plead it. So unless there are further questions, I thank the court for its time. Very well. Thank you for your argument. Mr. Quinlan, we'll hear from you in rebuttal. Thank you, Your Honor. May it please the court. Well, I think that the crux of this whole case can be narrowed down to counsel's statement where he said it's not that somehow the plaintiffs went from it's not now churches to it's now something else. Well, that's simply not true. It's not one or the other. It's both and. The pleading clearly, the reasonable inference from the factual allegations of the pleading are that plaintiffs were complaining about both what they could do inside their churches and what they could do otherwise. And the question of whether or not their individual churches might have imposed the nine-person rule and might have continued to impose a limitation on the number of persons is only half their problem. Because if, for example, hypothetically, they're not able to go to their church to engage in religious activity and they want to go someplace else to do that, whether it's a park or whether it's in somebody's home or whether it's in some other public venue, this order prohibits them from doing that. So it's not in either churches or. It's a both and. And that's clear from the allegations of paragraphs one through three. If you had something specific that, if your client said something specific that they wanted to do, why not just file a complaint and seek relief in order to do that a year ago? Because... Other than go through a year-long appeal, it seems... We really would have preferred not to go through a year-long appeal, which was necessitated by, frankly, an erroneous statement. I know you feel erroneous, but isn't it true that the judge dismissed without prejudice? So your clients could have said, we want to go to the park tomorrow with 20 people and sought relief? Well, at that point, we had no standing. We had no standing to ask for anything. We would have had to amend the pleading. We think that our pleading was sufficient on its face. That's the problem. Our pleading is sufficient and we need to vindicate the standard of review here. And our view is that we had a sufficient pleading. We pled both that we were precluded from gathering in groups larger than nine within our churches and outside of our churches. And to answer the question of whether or not churches might have expanded the status quo, the evidence actually submitted in the case by the county of the Archdiocese of St. Louis shows that when they loosened the order, they loosened up and they allowed more people in church. So the idea that the inference that's allowed by Wieland, that once the unconstitutional order was lifted, that we could reasonably infer that the status quo would return, it did. Any questions, if there are any? Seeing none, we thank you for your argument. Thank you, Your Honors. Thank you to both counsel. The case is submitted and the court will file an opinion in due course. Thank you, Your Honor. That concludes the argument session for this afternoon and the court will be in recess until further call at the docket.